IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| STEVEN SHEERAN and KELLY SHEERAN,<br><br>               Plaintiffs,<br><br>    v.<br><br>BLYTH SHIPHOLDING S.A., et al.<br><br>              Defendants. | HONORABLE JEROME B. SIMANDLE<br><br><br>Civil No. 14-5482 (JBS/AMD)<br><br><br>**OPINION** |

APPEARANCES:

Brian D. Kent, Esq.
LAFFEY BUCCI & KENT LLP
1435 Walnut Street, 7th Floor
Philadelphia, PA 19102
    -and-
Bruce David Zeidman, Esq.
COSKY & ZEIDMAN, Attorneys at Law
209 Haddon Ave.
Haddonfield, NJ 08033
    Attorneys for Plaintiffs

Patrick M. Northen, Esq.
Francis P. Maneri, Esq.
Jordan M. Rand, Esq.
DILWORTH PAXSON, LLP
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002
    Attorneys for Defendant Holt Logistics Corp.

John Philip Johnson, Jr., Esq.
COZEN O'CONNOR PC
457 Haddonfield Road, Suite 300
Cherry Hill, NJ 08002
    Attorney for Defendant Inchcape Shipping Services

Mary Elisa Reeves, Esq.
REEVES MCEWING LLP
719 E. Passyunk Avenue
Philadelphia, PA 19147
    Attorney for Defendant NYK Cool a/k/a Cool Carriers AB

**SIMANDLE**, Chief Judge:

## I.   INTRODUCTION

Plaintiff Steven Sheeran was injured while working aboard the M/V Swan Chacabucco in the Port of Gloucester, New Jersey. At this juncture, three Defendants remain: NYK Cool a/k/a Cool Carriers AB, Holt Logistics Corporation, and Inchcape Shipping Services. Presently before the Court are motions for summary judgment filed by each Defendant [Docket Items 73, 76 & 77], and an accompanying motion to seal filed by Holt. [Docket Item 74.] For the reasons set forth below, the Court will grant all Defendants' motions for summary judgment and grant Holt's unopposed motion to seal.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[1]

The facts surrounding Plaintiff's injury aboard the M/V Swan Chacabucco ("the Swan Chacabucco" or "the Ship") are straightforward. Plaintiff was employed as a longshoreman with Gloucester Marine Terminals, LLC ("GTL") from October 2011 until the day of his accident on January 23, 2012. (Deposition of Steven Sheeran ("Sheeran Dep.") at 27:12-21.) GTL had been hired as a stevedore to unload cargo at Gloucester Marine Terminal in

---

[1] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to Plaintiff, as the party opposing summary judgment.

2

Gloucester City, New Jersey. (Deposition of Walter Curran ("Curran Dep.") at 70:13-23.) GTL provided all longshoremen with safety trainings and a copy of a safety manual, although the parties dispute exactly how thorough and effective this training was. (Sheeran Dep. at 35:20-36:23.)

On January 23, 2013, Plaintiff was assigned to unload pallets of fruit from the holds of two ships: one in the morning, and the Swan Chacabucco in the afternoon. (Id. at 92:18-97:13.) Plaintiff had worked as a hold man discharging palletized fruit from ships at Gloucester Terminal before. (Id. at 104:17-24.) Sometime in the afternoon, Plaintiff was in the process of steadying a full pallet tray in the hold of the Swan Chacabucco while it was being lowered by a crane when the tray swayed and Plaintiff slipped and fell on the floor of the Ship's hold. (Id. at 190:1-191:20.) As soon as Plaintiff slipped, the tray lowered to the floor and crushed Plaintiff's left foot. (Id. at 195:2-12.) Plaintiff suffered "severe and permanent injuries" from the accident. (Third Amended Complaint ¶¶ 20, 26, 33, 39, 48, 55.) At the time of Plaintiff's accident, Steven Amato was the crane operator and Naman McRae was the signalman, both other GTL employees who had previously performed those roles. (Deposition of Steven Amato ("Amato Dep.") at 105:12-20; Deposition of Naman McRae ("McRae Dep.") at 23:12-24.) The tray

3

was owned by GLT and the crane was mounted on the Swan Chacabucco's deck and owned by the vessel's owner. (See Blyth Shipholding's Answers to Plaintiff's Interrogatories ¶¶ 8, 13, 16; see also Deposition of Jens Hedelund ("Hedelund Dep.") at 70:7-71:7.)

Plaintiff settled a workers' compensation claim pursuant to the Longshore and Harbor Workers' Compensation Act against GTL in June of 2014. (Application for Approval of Partial Settlement before Administrative Law Judge Adele Odegard.) This suit, originally filed in the Superior Court of New Jersey, Camden County, followed in September of 2014. [Docket Item 1.] The three moving Defendants remain: Holt Logistics Corporation, NYK Cool, and Inchcape Shipping Services.

Holt Logistics Corporation

Holt Logistics Corporation ("Holt Logistics") is a company owned by the same family ("the Holt brothers") that owns Plaintiff's former employer, GTL. (Deposition of Peter Inskeep ("Inskeep Dep.") at 40:23-41:8.) GTL's business consists of "receiving and delivering cargo from both trucks and railroad, and then loading or discharging cargo to or from ships that berth there." (Curran Dep. At 70:13-23.) Holt Logistics is an independently-managed company that provides information technology, human resources, payroll, accounting, marketing, and

other back-end administrative services to GTL and the other companies owned by the Holt brothers. (Inskeep Dep. at 40:14-19; Deposition of Michael J. Quigley ("Quigley Dep.") at 37:10-19; Curran Dep. at 108:13-23.) The Client Services Agreement between GTL and Holt Logistics provides that Holt Logistics will furnish "administrative services (the Back Office Services)" but is not "responsible for the operation of [GTL's] business, nor for supervision of [GTL's] employees." (Client Services Agreement, Exhibit Under Seal.) Holt Logistics does not have its own safety department (Quigley Dep. at 37:23-38:2), and GTL management-level employees testified at their depositions that Holt Logistics had no authority to supervise GTL's stevedoring operations at the terminal, "run any operations," provide safety trainings, train new GTL employees, supervise GTL employees, or "make decisions on behalf of Gloucester Terminals."(Curran Dep. at 72:12-73:2, 146:2-5, 199:4-10; Inskeep Dep. at 96:5-98:10; Quigley Dep. at 72:15-73:7.) While Holt Logistics employees like Mr. Inskeep[2] consulted for GTL, that consulting appears to have been limited to making recommendations to improve the efficiency of GTL's operations, consistent the Client Services Agreement, and all findings were reported to the GTL manager of operations

---

[2] Mr. Inskeep was a Holt Logistics employee until he succeeded Mr. Curran as GTL's manager of operations on December 31, 2011.

5

who "was in charge of all of Gloucester Terminals" and had the power to make decisions over GTL staffing and operations. (Inskeep Dep. at 48:15-49:15.)

NYK Cool

At the time of Plaintiff's accident, the Swan Chacabucco was owned by Blyth Shipholding, S.A. ("Blyth Shipholding" or "Blyth"), and under a term charter to NYK Cool AB a/k/a Cool Carriers AB ("NYK Cool"). (Charter Party dated July 14, 2011.) Pursuant to the terms of the charter party, it was the owner's responsibility to maintain and repair the vessel and its equipment, employ its crew, and assume care of the cargo, and the time charterer's responsibility to arrange and pay for cargo and its loading and unloading at various ports, and pay all port charges. (Id. at ¶¶ 11, 29, 49.) NYK Cool contracted with GTL to provide stevedoring services at Gloucester Marine Terminal to discharge palletized fruit exported from Chile from November 1, 2010 through October 31, 2013. (Stevedoring and Terminal Operating Agreement dated November 1, 2010.) Pursuant to the terms of the stevedoring agreement, GTL was to "furnish sufficient and adequate supervision, personnel, suitable mechanical equipment, gear, forklifts and any other items of equipment necessary for the handling of the cargo." (Id. at ¶ 1.2.) NYK Cool also contracted with Inchcape Shipping Services

6

("Inchcape") to serve as its port agent at Gloucester Marine
Terminal. (Agency Agreement dated December 18, 2011.) The agency
agreement provided that Inchcape would "liase with terminals,
stevedores, receivers, shippers and NYKC's representative,"
coordinate the arrival, discharge, and departure of NYK Cool's
vessel at the terminal, and handle all documentation for the
vessel. (Id. at ¶¶ 2.01-2.28.)

NYK Cool did not provide or inspect the crane or cargo tray
involved in Plaintiff's accident, nor did it pay, train, or
supervise any of the longshoremen. (Hedelund Dep. at 70:7-
72:13.) In fact, it did not have authority to direct the cargo
operations handled by the stevedore GTL, or train or supervise
GTL's longshoremen. (Id. at 72:9-13; Curran Dep. at 196:5-197:7,
200:16-201:202-21, 204:11-207:23; Inskeep Dep. at 94:5-95:4;
Deposition of Theodoros Bakiroglou ("Bakiroglou Dep.") at 125:3-
126:15.) NYK Cool's port captain, Mr. Hedelund, was not required
to be present at the port for unloading operations but was in
Gloucester on and off during Chilean fruit season, December
through April, including on the day of Plaintiff's accident.
(Hedelund Dep. at 16:12-17:17:22, 46:14-18.) The port captain's
role is to "coordinate the discharging of the ship as a
communication link between the stevedores, vessels and agents."
(Id. at 42:5-11.) This includes communicating, by phone and

email, with the ship when, where, and how many gangs will be
required to discharge the vessel based on the number of
containers, the warehouse space available, and the weather. (Id.
at 44:9-46:8.) There is no evidence that Mr. Hedelund was
present at the port at the time of Plaintiff's accident and he
was not informed that it had occurred until much later. (Id. at
55:2-58:8.)

Inchcape Shipping Services

As mentioned above, Inchcape was hired by NYK Cool to serve
as its port agent at Gloucester Marine Terminal (and at ports in
Philadelphia, Wilmington, Delaware, and Long Beach and Los
Angeles, California). (Agency Agreement dated December 18,
2011.) The agency agreement sets forth Inchcape's general
responsibilities at port on NYK Cool's behalf, including, inter
alia: "keep NYKC informed by quickest means of any special
occurrence connected with the vessel, her crew and cargo and
follow in this respect the instructions of NYKC;" "administering
the following contracts on behalf of NYKC which NYKC may have
with other agent [sic] which for this purpose to include
stevedores, terminal operators, pilotage companies, towing
companies;" "supervise and co-ordinate the activities of
stevedores and terminal operators to ensure efficient rotation
and the most economical dispatch of the ships. NYKC Port Captain

coordinates activities of stevedore if available;" and "liase with terminals, stevedores, receivers, shippers and NYKC's representative" and handle all documentation for the vessel. (Id. at ¶¶ 1(b), 3(b), 9(b), and Addendum No. 1 ¶¶ 2.01-2.28.) The contract specifically provides that "This Agreement is not an exclusive arrangement and either party may engage other agents in support of their business activities. (Id. at ¶ 7.)

Inchcape's specific agency instructions with respect to the Swan Chacabucco's call at Gloucester Marine Terminal were set forth in a separate Port Agency Appointment & Pro-forma Disbursement Account Request. (Port Agency Appointment dated January 11, 2012.) Generally, this document instructed Inchcape to keep in daily contact with NYK Cool regarding the discharging operations of the Ship, and to collect and forward all invoices for taxes, dues, and levies through NYK Cool's preferred online system. (Id.)

Inchcape's port agent in Gloucester, Mr. Hubbard, described his role as follows: "I . . . advised ETAs to the terminal, the port captain, authorities, ordered pilots, tugs, lines handlers, Customs, Immigration. Made sure paperwork was filed with the U.S. Coast Guard so the ship could enter without delay, and communicated with the port captain and the vessel for any specific requirements." (Deposition of Justin Hubbard ("Hubbard

9

Dep.") at 60:24-61:13.) He testified that he did not
"administer" any contracts for the work of stevedores or
terminal operators because that "happened outside us," by which
he meant that NYK Cool contracted directly with stevedores
without involving Inchcape, and that it was "not [his] job" to
coordinate stevedore activities or provide NYK Cool a plan for
discharging the vessel. (Id. at 61:14-64:14, 89:5-13; see also
id. at 69:11-17.)

Mr. Hubbard's testimony is corroborated by Mr. Hedelund,
the port captain for NYK Cool: "The agent performs two functions
for us. They have a documentation side under Inchcape Logistics,
which handled all the paperwork related to the cargo. And then
you got an operations side, which handles the ordering of pilots
and linesmen, tugboats, and they handle, typically handle,
owners' matters like delivery of provisions, spare parts. The
operations department takes care of any bunkering arrangement to
get oil onboard, and the produce the statement of fact together
with the vessel's Master." (Hedelund Dep.at 24:22-25:24.) Mr.
Hedelund further testified that, when he was port captain, he
never understood that Inchcape had been contracted to administer
the stevedoring contract in Gloucester or oversee stevedoring
operations. (Id. at 31:10-34:7, 41:8-43:3.) Mr. Bakiroglou, the
Ship's captain, similarly stated that Inchcape's role at the

port was administrative only. (Bakiroglou Dep. at 129:8-132:8.)
Likewise, Mr. Inskeep testified that he would "have a huge
problem" if Inchcape exercised any supervisory role over GTL's
stevedores because "they're not their employees. They have no
say. It's not their lane. I would probably ban them from the
pier, to be honest with you. . . . They don't really have a role
directly with us; their role is with the ship, the vessel
owners. It is coordinating, at least my understanding it is
coordinating food, it's setting up arrival, it's getting bunker
for them. Has nothing to do with the labor or our operations."
(Inskeep Dep. at 90:20-93:4.) Mr. Curran, too, said that
Inchcape "never" had control over the GTL stevedores, and that
they merely advised GTL "when the ship was arriving and when
they wanted to sail, potential sailing time. Other than that,
that was pretty much it." (Curran Dep. at 194:12-195:17.)

**III. STANDARD OF REVIEW**

    Federal Rule of Civil Procedure 56(a) generally provides
that the "court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact" such
that the movant is "entitled to judgment as a matter of law."
FED. R. CIV. P. 56(a). A "genuine" dispute of "material" fact
exists where a reasonable jury's review of the evidence could
result in "a verdict for the non-moving party" or where such

fact might otherwise affect the disposition of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. Id. Conclusory, self-serving submissions cannot alone withstand a motion for summary judgment. Gonzalez v. Sec'y of Dept. of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012) (internal citations omitted).

In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, here the Plaintiff, and must provide that party the benefit of all reasonable inferences. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014). However, any such inferences "must flow directly from admissible evidence [,]" because "'an inference based upon [] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990); citing Anderson, 477 U.S. at 255).

## IV. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. (the "LHWCA" or "the Act"), governs an injured longshoreman's claims. In particular, § 905 codifies the

exclusive remedy for injured longshoremen, and provides in

pertinent part:

> The liability of an **employer** prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee . . .
>
> In the event of injury to a person covered under this chapter caused by the negligence of a **vessel**, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title . . . If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. . . . The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(a)-(b) (emphasis added). The LHWCA defines a

"vessel" to include "vessel's owner, owner pro hac vice, agent,

operator, charter or bare boat charterer, master, office, or

crew member." 33 U.S.C. § 902(21). "Although several courts have

identified certain ambiguity in the definition of 'vessel' under

the LHWCA, extant authority reflects that the LHWCA plainly

includes 'time charterers' and 'bareboat charters' . . . within

its statutory scope." Jones v. Sanko Steampship Co., Ltd., 148

F. Supp. 3d 374, 387 (D.N.J. 2015) (collecting cases). The

Supreme Court has concluded that vessel owners owe longshoremen

three general duties:

> (1) a 'turnover duty,' which relates to the condition of the ship upon commencement of stevedoring operations and

13

> includes a corollary duty to warn; (2) an 'active operations duty,' which requires that a vessel exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel;' and (3) a 'duty to intervene,' which imparts an obligation upon the vessel to intervene in certain circumstances in areas under the principal control of the independent stevedore.

Id. (citing Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981) and Howlett v. Birkdale Shipping Co., 512 U.S. 92 (1994)).

LHWCA's exclusivity provisions do not preclude an injured longshoreman from asserting negligence claims against third parties other than the employer. 33 U.S.C. § 933(i). The "general maritime negligence standard" is "the duty of exercising reasonable care under the circumstances of each case." Goldsmith v. Swan Reefer A.S., 173 Fed. Appx. 983, 988 (3d Cir. 2006) (citing Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 632 (1959)). To prevail on a maritime negligence claim, a plaintiff must prove "(1) a duty of care which obliges the person to conform to a certain standard of conduct; (2) a breach of that duty; (3) a reasonably close causal connection between the offending conduct and the resulting injury; and (4) actual loss, injury or damages suffered by the Plaintiff." Galentine v. Estate of Stekervetz, 273 F. Supp. 2d 538, 544 (D. Del. 2003) (citing 1 Thomas Shoenbaum, Admiralty and Maritime Law § 5-3 at 170 (3d ed.

14

2001)).

**A. Holt Logistics[3]**

Plaintiff alleges that Holt Logistics "was responsible for controlling, managing, operating, and/or supervising the stevedoring and/or longshoring operations of Gloucester Terminals, LLC, and therefore owed a duty to exercise reasonable care in the work to be performed on the M/V Swan Chacabucco

---

[3] Holt Logistics has also filed an unopposed motion to seal [Docket Item 74] Exhibit I to its motion for summary judgment, which contains the Client Services Agreement between Holt Logistics and GTL. Local Civil Rule 5.3(c) generally allows the Court to restrict public access to any privileged or otherwise confidential materials or judicial proceedings upon request by any party.  L. CIV. R. 5.3(c)(1).  The party seeking to seal documents or to otherwise restrict public access must demonstrate: (a) the nature of the materials or proceedings at issue; (b) the legitimate private or public interests which warrant the relief sought; (c) the clearly defined and serious injury that would result if the relief sought is not granted; and (d) why a less restrictive alternative to the relief sought is not available.  See L. CIV. R. 5.3(c)(2).

Here, Holt Logistics argues that the Client Services Agreement, designated as "Confidential," contains "proprietary, nonpublic business information . . . which would cause substantial injury to Holt Logistics if disclosed publicly." (Holt Br. at 1, 4.) Defendant also represents that this document is subject to the parties' confidentiality agreement. Finally, Defendant argues that no less restrictive alternative to sealing is available because only a single exhibit of the entire summary judgment record will be sealed.

The Court finds that Holt Logistics has satisfied the factors set forth in L. Civ. R. 5.3(c), and holds that Plaintiff has demonstrated good cause under the Rule for this exhibit to be sealed from the public. The Court finds that the Client Services Agreement contains nonpublic business information, is limited in scope, and poses a risk of harm to Holt Logistics if disclosed. Consequently, Holt Logistic's motion to seal will be granted.

and/or at the Port and to provide a safe work environment for the Plaintiff Steven Sheeran, who was a business invitee upon the premises at all relevant times." (Third Amended Complaint [Docket Item 62] at ¶ 30.) In other words, Plaintiff asserts that Holt Logistics exercised day-to-day control over GTL's stevedoring operations, and accordingly assumed a duty of care to longshoremen like Plaintiff. The parties do not dispute that federal maritime law controls Plaintiff's dispute, and that his claims are based in LHWCA's § 933(i) exception.[4]

As a general matter, it is the stevedore's obligation "to avoid exposing the longshoremen to unreasonable hazards." Scindia, 451 U.S. at 170. The LHWCA "requires the stevedore, the longshoremen's employer, to provide a 'reasonably safe' place to work and to take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine to be necessary to avoid injury to longshoremen." Id. (emphasis added). Maritime tort law imposes a duty of care on one "who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person," as Plaintiff contends Holt Logistics has done with respect to GTL's

---

[4] Accordingly, the Court need not address two of Holt Logistics' alternative arguments, that it is not liable to Plaintiff as an alter ego of GTL, or that it is not liable to Plaintiff if New Jersey common law applies to this action. (Holt Br. at 28-34.)

stevedoring operations, only where

> (a)  His failure to exercise reasonable care increases the risk of such harm, or
> (b)  He has undertaken to perform a duty owed by the other to the third person, or
> (c)  The harm is suffered because of reliance of the other or the third person upon the undertaking.

Patentas v. United States, 687 F.2d 707, 715 (3d Cir. 1982)

(citing Restatement of Torts § 324A.) In short, Holt Logistics

can only be liable to a longshoreman in negligence if it assumed

control over GTL's stevedoring operations.

Plaintiff relies on testimony from Mr. Inskeep, a former

Holt Logistics employee who consulted with GTL on a number of

"back office" issues, to support his position that Holt

Logistics was directly involved in GTL's stevedoring operations.

Plaintiff's expert witness, Thomas Bolcar, opined that "Holt

Logistics, through its employee, Mr. Inskeep, was clearly and

directly involved in and responsible for the stevedoring

operations of Gloucester Terminals" because Mr. Inskeep assisted

Mr. Curran, the then-manager of operations at GTL, in hiring a

new manager of stevedoring operations at GTL, and because Mr.

Inskeep "analyzed operations at Gloucester Terminals, reporting

his observations directly to top Holt Logistics management, and

then implementing changes at Gloucester Terminals." (Bolcar

Expert Report at 7, 10.) But Plaintiff – and Mr. Bolcar –

misrepresent Mr. Inskeep's testimony, and ignore his repeated

17

statements that he always worked under, or in consultation with,
Mr. Curran while he was at Holt Logistics and that the
consulting advice he provided to GTL was "almost to a T" what
Holt Logistics had contracted to provide in the Client Services
Agreement. (Inskeep Dep. at 96:5-98:10.) In fact, Mr. Inskeep's
testimony was consistent with that of other GTL managers that
only GTL managers had authority to oversee GTL's stevedoring
operations at the terminal or "make any decisions on behalf of
Gloucester Terminals" (Curran Dep. at 72:12-73:2, 146:2-5,
199:4-10; Quigley Dep. at 72:15-73:7), and consistent with the
Client Services Agreement that shows that Holt Logistics
provides "administrative services (the Back Office Services)"
but is not "responsible for the operation of [GTL's] business,
nor for supervision of [GTL's] employees." (Client Services
Agreement, Exhibit Under Seal.) To the contrary, Mr. Inskeep's
testimony does not show that he or Holt Logistics "under[took]
to perform a duty owed by [GTL] to the [longshoremen],"
Patentas, 687 F.2d at 715, and Mr. Bolcar's opinion alone cannot
create a dispute of material fact where it is not supported by
facts in the record. Elcock v. Kmart Corp., 233 F.3d 734, 755 n.
12 (3d Cir. 2000).[5] Because there is no evidence in the record by

---

[5] Plaintiff also relies on purported screenshots of LinkedIn.com
profiles for Mr. Inskeep and Mr. Florkiewicz, GTL's stevedoring
manager, showing that both men "hold themselves out" as Holt

18

which a jury could reasonably find that Holt Logistics

controlled GTL's stevedoring operations, Holt Logistics owed

Plaintiff no duty of care as a matter of law. Holt Logistics'

motion for summary judgment will be granted.

### B. NYK Cool

_____

Logistics employees. On summary judgment, the Court may only
consider evidence that is "potentially admissible at trial."
Webster v. Dollar General, Inc., 197 F. Supp. 3d 692, 700
(D.N.J. 2016) (citing City Select Auto Sales, Inc. v.
David/Randall Assocs., 96 F. Supp. 3d 403, 409 n. 4 (D.N.J.
2015) and Fed. R. Civ. P. 56(c)(4)). Before considering hearsay
statements in a motion for summary judgment, the Court must
"determine if the nonmoving party can produce admissible
evidence regarding a disputed issue of material fact at trial."
Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d
231, 238 (3d Cir. 2016). The proponent must "explain the
admissible form that is anticipated." Id.
     Plaintiff has failed to demonstrate how these LinkedIn
profiles would be admissible at trial. No witness has
authenticated these printouts, Fed. R. Evid. 901, or explained
when they were created or last updated to determine whether they
are probative of Mr. Inskeep or Mr. Florkiewicz's relationship
to Holt and GTL, either at the time of Plaintiff's accident or
today. Moreover, these profiles are a quintessential example of
an out of court statement offered to prove the truth of the
matter asserted in the statement, i.e. that Mr. Inskeep and Mr.
Florkiewicz are employees of Holt, not GTL. Fed. R. Evid.
801(c). There is no indication in the record that Holt prepared
and posted these profiles, or authorized Mr. Inskeep and Mr.
Florkiewicz to do so, such that these statements are admissible
against Holt as the statement of a party opponent. Fed. R. Evid.
801(d)(2). Finally, there is no reason to find that Plaintiff
might be able to introduce these statements at trial, i.e. that
if these declarants were called as witnesses at trial, they
would testify that they regard themselves as Holt employees.
Their deposition testimony on point was directly contradictory.
Accordingly, these LinkedIn profiles are inadmissible and are
insufficient to create a material dispute of fact on summary
judgment.

Plaintiff's claims against NYK Cool arise under both 33 U.S.C. §§ 905(b) and 933(i). Plaintiff alleges that NYK Cool "as charterer of the Swan Chacabucco, owed a duty to exercise reasonable care in the work to be performed on the Ship and/or at the Port and to provide a safe work environment for the Plaintiff, Steven Sheeran, who was a business invitee upon the premises at the all [sic] relevant times" that it breached by, inter alia, failing to inspect the premises, supervise work at the port, and have a safety program and designated safety person. (Third. Am. Compl. ¶¶ 18-22.) He also alleges that NYK Cool is liable for Plaintiff's accident as the "owner" or "owner pro hac vice" of the Swan Chacabucco. (Id. at ¶¶ 42-48.)

The parties do not dispute that NYK Cool was the time charterer of the Ship, and this conclusion is consistent with the record presently before the Court. (Compare NYK Cool's Statement of Undisputed Facts ¶ 2 with Plaintiff's Response to Defendant NYK Cool's Statement of Undisputed Facts ¶ 2.) A "time charterer obtains use of a vessel's carrying capacity for a fixed charter period, while the vessel owner (bareboat charterer or owner pro hac vice) retains control of the vessel's management and navigation." Jones, 148 F. Supp. 3d at 378 n.4 (citing Dougherty v. Navigazione San Paolo, S.P.A. Medafrica Line, 622 F. Supp. 1, 1 (E.D. Pa. 1984)); see also JJ Water

20

Works, Inc. v. San Juan Towing and Marine Servs. Inc., 59 F.
Supp. 3d 380, 392 (D.P.R. 2014) ("The principal distinction
between the [bareboat and time charter] depends on the degree of
control retained by the owner of the vessel. Under a time
charter, the charterer engages for a fixed period of time a
vessel, which remains manned and navigated by the vessel owner,
to carry cargo wherever the charterer instructs. The owner
remains in possession and control of the chartered vessel,
provides a crew, and is responsible for normal operating
expenses." (internal citations omitted).) Here, the charter
party identifies Blyth Shipholding as the Swan Chacabucco's
owner and NYK Cool as the "charterer," for a period beginning
January 1, 2012 up to December 31, 2012. (Charter Party at 1.)
The charter party required Blyth to "maintain the Vessel" and
"provide and pay for the maintenance and repairs to the Vessel,"
and "ensure that the Vessel is at all times manned with an
experienced Master, Officers and Crew" and pay their wages. (Id.
at ¶¶ 11, 34.) In fact, the Ship's captain, Mr. Bakiroglou,
testified that he was employed by Chartworld on behalf of Blyth.
(Bakiroglou Dep. at 102:5-15.) Because Blyth retained control of
the Ship and provided its crew, NYK Cool could not have been an
owner pro hac vice. Accordingly, NYK Cool can only be liable to
Plaintiff if it breached a duty owed to him in its capacity as a

time charterer, responsible for the commercial and logistical aspects of the Ship's call at Gloucester Marine Terminal.

"Although the overwhelming weight of authority makes plain that 'time charterers' . . . qualify as a vessel within the meaning of § 905(b), equal authority states that the duties applicable to a vessel owner differ from the duties imparted upon" an owner pro hac vice and a time charterer. Jones, 148 F. Supp. 3d at 393. "In general, a time charterer that has no control over the vessel assumes no liability for negligence, unless the harm occurs within the charterer's traditional sphere of control and responsibility or has been transferred to the charterer by the clear language of the charter agreement." Id. (citing Kerr-McGee v. Ma-Ju Marine Servs., Inc., 830 F.2d 1332, 1343 (5th Cir. 1987)). Stated otherwise, "a time charterer may be liable to a longshoreman only if the time charterer acts independently negligently or otherwise unreasonably in relation to its own charter activities." Id.

Plaintiff's position that NYK Cool owed him a duty to provide a safe environment aboard the Ship is inconsistent with well-settled law that "imposing a duty upon vessels to supervise and inspect cargo operations for the benefit of longshoremen then on board would undermine Congress' intent in § 5(b) [of the LHWCA] to terminate the vessel's automatic, faultless

22

responsibility for conditions caused by the negligence or other
defaults of the stevedore." Howlett, 512 U.S. at 101 (citing
Scindia, 451 U.S. at 168); see also Derr v. Kawasaki Kisen K.K.,
835 F.2d 490, 493 (3d Cir. 1987) ("Scindia compels the holding
that the shipowner has no duty to supervise or inspect cargo
loaded or unloaded by stevedores and therefore may not be held
liable for injuries arising out of the stevedore's failure to
perform his job properly.").

As applied here, Plaintiff has identified nothing that NYK
Cool or its port captain did or failed to do "in relation to its
own charter activities" that touches on the crane, tray, or
longshoremen who injured Plaintiff, or anything in NYK Cool's
contracts with either Blyth or GTL by which it assumed a duty to
control stevedoring operations. NYK Cool's representative
testified that his role at Gloucester Marine Terminal was to
"coordinate the discharging of the ship as a communication link
between the stevedores, vessels and agents" by phone and email.
(Hedelund Dep. at 42:5-11, 44:9-46:8.) Indeed, it is undisputed
that NYK Cool representatives would not have been permitted by
any of GTL's managers to direct the cargo operations, supervise
longshoremen, or advise the stevedore as to which particular
longshoremen should be permitted to work in which particular
roles in the unloading operation. (Id. at 72:9-13; Curran Dep.

23

at 196:5-197:7, 200:16-201:202-21, 204:11-207:23; Inskeep Dep.
at 94:5-95:4; Bakiroglou Dep. at 125:3-126:15.)

In response, Plaintiff points only to his expert Mr.
Bolcar's opinion that NYK Cool owed, and breached, <u>Scindia</u>
duties and United Nations codes to Plaintiff based on its role
as "the operators" of the Ship. (Bolcar Expert Report at 4, 8,
10.) Contrary to Mr. Bolcar's assumption that NYK Cool was the
owner, owner pro hac vice, or bareboat charterer of the Ship,
the record demonstrates that NYK Cool was <u>not</u> "responsible for
crewing the vessel and the actions of the crew." (<u>Id.</u> at 4.)
Those responsibilities rested with Blyth. Where an expert's
opinion is not grounded in the facts of the case, it may be
disregarded. <u>Elcock</u>, 233 F.3d at 755 n. 12. Accordingly, because
there are no material factual disputes about NYK Cool's role
with regards to the Ship, and no evidence that it breached any
duties owed or undertaken as the time charterer, NYK Cool's
motion for summary judgment will be granted.

### C. Inchcape Shipping Services

Finally, Plaintiff alleges that "Inchcape, as the port
agent, owed a duty to exercise reasonable care in the work to be
performed on the M/V Swan Chacabucco and/or at the Port and to
provide a safe work environment for the Plaintiff, Steven
Sheeran, who was a business invitee upon the premises at the all

24

relevant times," and breached it by, inter alia, failing to "safely coordinate the work on the premises" and "hire competent employees, safety inspectors, contractors and subcontractors." (Thid Am. Compl. ¶¶ 37, 40.)

As a general matter, "[t]he liability standard for a general agent is the same as that for a shipowner under the LHWCA." Marino v. Kent Line Intern., 256 Fed. Appx. 448, 452 n. 2 (3d Cir. 2007) (citing 33 U.S.C. § 902(21)). As the agent for NYK Cool, "a time charterer [with] no control over the vessel," Inchcape likewise assumed "no liability for negligence, unless the harm occurs within the charterer's traditional sphere of control and responsibility or has been transferred to the charterer by the clear language of the charter agreement." Jones, 148 F. Supp. 3d. at 393 (citing Kerr-McGee v. Ma-Ju Marine Servs., Inc., 830 F.2d 1332, 1343 (5th Cir. 1987)).

Here, it is not "clear" from the language of the agency agreement that any control or responsibility over stevedoring operations had been transferred to Inchcape.[6] Moreover, agency

---

[6] Plaintiff's expert Mr. Bolcar's opinion to the contrary is unavailing because, as a stevedore superintendent, he is not qualified to render an opinion about the interpretation or enforceability of a contract. (See Deposition of Tom Bolcar ("Bolcar Dep.") at 156:15-18, 159:11-161:18, 166:10-168:18, 171:18-172:19.) Only a witness "qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharma., Inc., 509 U.S. 579

authority "exists only in accordance with manifestations of the
principal and, as to transactions capable of delegation to the
agent," and NYK Cool could not have delegated responsibility
over stevedoring operations which it itself did not hold. Third
Restatement of Agency § 7 & Cmt. (a). The agency agreement, when
read as a whole, does not unambiguously obligate Inchcape to
supervise the activity of the stevedores, as Plaintiff argues.[7]
Contracts "must be read as a whole, without artificial emphasis
on one section, with a consequent disregard for others." Borough
of Princeton v. Bd. of Chosen Freeholders of Cnty. of Mercer,
755 A.2d 637, 645 (N.J. App. Div. 2000). Paragraph 9(b), which
would be Plaintiff's strongest evidence that Inchcape undertook
responsibility for stevedoring operations, is internally
inconsistent: it both provides that "The Agent shall supervise
and co-ordinate the activities of the stevedores and terminal
operators," and that "NYKC's port captain coordinates activities
of stevedores if available." (Agency Agreement.) Both of these
statements likewise stand in tension with Paragraph 7's non-

_____

(1993).
[7] "The interpretation of a contract is ordinarily a legal
question for the court and may be decided on summary judgment
unless there is uncertainty, ambiguity or the need for parol
evidence in aid of interpretation. . . . The interpretation of
the terms of a contract are decided by the court as a matter of
law unless the meaning is both unclear and dependent on
conflicting testimony." Celanese Ltd. v. Essex Cnty. Improvement
Authority, 962 A.3d 591, 600 (N.J. App. Div. 2009).

exclusivity provision, "This agreement is not an exclusive agreement and either party may provide services to or engage other agents in support of their business activities." (Id.) And Plaintiff makes no effort to square his isolated reading of a few stray lines in the agency agreement with the specific instructions given to Inchcape with respect to the Swan Chacabucco's call at Gloucester Marine Terminal in January, 2012, which says nothing about stevedores (see generally Port Agency Appointment), and with NYK Cool's separate agreement with GTL for stevedoring services. (See Stevedoring and Terminal Operating Agreement.) Accordingly, because Inchcape's agency agreement did not transfer responsibility over stevedoring operations "by the clear language of the charter agreement," it can only be liable to Plaintiff for his injury if it acted negligently with respect to something within its "traditional sphere of control and responsibility" as port agent. Jones, 148 F. Supp. 3d. at 393.

The record is devoid of any evidence that Inchcape's role as a port agent implicated the equipment or longshoremen that caused Plaintiff's accident. Rather, Inchcape has pointed to consistent testimony from Mr. Hubbard and representatives from NYK Cool, GTL, and the Ship demonstrating that its role as agent was entirely administrative and logistical, and consisted

primarily of filing paperwork for the Ship and communicating the timing of the Ship's arrival at port and unloading operations with all relevant parties, including NYK Cool, the Ship's Captain, the stevedore, the Coast Guard, and Customs and Immigration. (Hubbard Dep. at 60:24-64:14, 69:11-17, 89:5-13; see also Hedelund Dep.at 24:22-25:24, 31:10-34:7, 41:8-43:3; Bakiroglou Dep. at 129:8-132:8; Inskeep Dep. at 90:20-93:4; Curran Dep. at 194:12-195:17.) In response, Plaintiff relies solely on Mr. Bolcar's inadmissible expert opinion to create a material legal, not factual, dispute about the interpretation of the agency agreement. Because there are no material factual disputes about Inchcape's role with regards to the Ship, and no evidence that it breached any duties owed or undertaken as the port agent for the Ship's time charterer, Inchcape's motion for summary judgment will be granted.

**IV. CONCLUSION**

For the foregoing reasons, the Court will grant all Defendants' motions for summary judgment, and Holt Logistics's unopposed motion to seal. An accompanying Order will be entered.


**March 27, 2017**                    **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      Chief U.S. District Judge

28